## PHILLIPS PETROLEUM CO. v. OCHSNER.

### No. 10847.

Circuit Court of Appeals, Fifth Circuit.

Dec. 15, 1944.

Rayburn L. Foster, Don Emery, and R. B. F. Hummer, all of Bartlesville, Okl., E. H. Foster, Warren M. Sparks, and R. S. Trippet, all of Amarillo, Tex., for appellant.

Erwin C. Ochsner and Riley Strickland, both of Amarillo, Tex., for appellee.

Before HUTCHESON and WALLER, Circuit Judges.

HUTCHESON, Circuit Judge.

The suit was for royalty on dry sweet gas produced by appellant from lands of appellee in Moore. County, Texas. The claim was: (1) That within the meaning of the lease, "the gas was used off the premises" for light and fuel purposes; (2) that the gas had no market value for such · purposes at the well; and (3) that, therefore, lessor was entitled to be paid its "value at the mouth of the well" for light

and fuel purposes by resort to, and proof of, all relevant factors. The defense was: (1) that though there was no market at the well for the gas for light and fuel purposes, there was an established market there for the gas for gasoline plant operation uses; and (2) that the market value thus established measured plaintiff's recovery and made inadmissible resort to evidence as to amounts paid elsewhere in the field for gas for light and fuel. There was no real dispute in the evidence.[1] It es-

---

[1] Appellant took the gas sued for from plaintiff's well and delivered it into the pipe line of Texoma Natural Gas Company in exchange for an equal quantity of the same quality gas located in Gray County, Texas, which appellant took into its Pampa gasoline system and processed for natural gasoline. Appellant computed royalty payable to appellee based on the value of gas as reflected by appellant's purchases of gas which it processed in its Pampa system, which was somewhat higher than the price received by appellant upon the sale of substantial quantities of gas of like quality. The total amount tendered by appellant for ⅛ of the above stated volume of gas produced during the period May, 1938, through December, 1942, was $3,122.99 after deducting gross production taxes, which amounts to a weighted average of .66¢ per MCF, or $3,305.81 before deducting gross production taxes, or an average of .68¢ per MCF. Appellee rejected the tender. The monthly prices tendered ranged from a low of .52¢ to a high of 1.2¢ per MCF. During this same period, Phillips sold 10,377.009 MCF of all types of gas and received therefor a weighted average price of .606¢ per MCF. Plaintiff's gas, together with other dry sweet gas of like quality went through Texoma's pipe line to the light and fuel market in Chicago. None of the gas from plaintiff's well was taken or used by defendant for gasoline plant purposes. The Panhandle gas field extends from southern Wheeler County in a northwesterly direction through Wheeler, Gray, Carson, Potter, Hutchinson, Moore and Hartley Counties, Texas. It is approximately 124 miles long, with an average width of 20 miles. The west sweet field is that portion of the field lying west of a line drawn north and south through the town of LeFors. The east sweet field is that area lying east of that line which includes that portion of the field lying in Wheeler and Collingsworth Counties and the east portion of Gray County. The field is one in fact, however, the areas being interconnected. Oil is also produced in a portion of the west field, and from the oil wells large quantities of casinghead gas are produced. The west field produces all three types of gas, namely, dry sweet gas, dry sour gas, and casinghead gas.

There are 40 or 50 casinghead gasoline plants in the Panhandle field, owned and operated by many different companies, most of which process all three types of gas. Gas is purchased and sold for gasoline plant operating purposes (for processing by all gasoline plant operators other than the five interstate pipe line companies) under forms of contract which provide for payment on the basis of two factors, viz., (1) the gasoline content as disclosed by a field test applied to the current market value of 26-70 natural gasoline, and (2) a share in the proceeds of the sale of residue gas. During the period here involved, the prevailing prices paid for dry sweet gas of the type of the Ochsner gas ranged from .5¢ to .8¢ per MCF with an occasional flat price of 1¢ per MCF.

There are 5 interstate pipe line companies, namely, Canadian River Gas Co., Cities Service Gas Co., Texoma Natural Gas Co., Northern Natural Gas Co., and Panhandle Eastern Pipe Line Co., which produce gas from the Panhandle field and transport it to markets in other states. Those companies are referred to herein as the pipe line companies. For the most part, these companies own their own gas leases and produce gas therefrom, but in some instances they have entered into long term contracts for the purchase of gas from other producers. By the terms of such contracts, the producer is required to gather the gas at the well and deliver it into the main pipe line of the pipe line company under certain required pressures, and the producer is required to dedicate a large amount of acreage to the performance of the contract or is required to guarantee delivery of large quantities of gas over a long period of time. Most of the companies purchase no gas. None of them have or will purchase gas at the mouth of the wells. It is conceded that there is no market for dry sweet gas at the mouth of the wells for pipe line purposes (the pipe line companies will not buy it). It is also established, indeed it is conceded, that there is a market at the mouth of the well for all types of gas, including dry sweet gas, for gasoline plant operating purposes. (The gasoline manufacturers exclusive of the pipe line companies will buy it.)

140

tablished, indeed it was conceded, that there was no market value at the well for the gas for light and fuel purposes. It was equally established that there was a regular and established market for the gas for gasoline plant uses. Neither when the evidence was in was there any dispute between the parties as to the real issue to be determined, "the market value of the gas at the well, or if it had no market value, its value there". Over defendant's objection the District Judge let in a mass of evidence as to royalties and prices paid by pipe lines in the field for gas for light and fuel. Over the objection of plaintiff, that he was entitled to the value of the gas for what he called its higher or primary use, that is for light and fuel, and that evidence of its market value for gasoline plant purposes was inadmissible, the court admitted the evidence which established that the gas had a market value at the well.

The evidence in, defendant moved that the jury be instructed to return a verdict for plaintiff for the amount tendered him on the ground that the undisputed evidence established that the gas had a market value at the well, and that this value did not exceed the tendered amount. In the alternative, it requested that the jury be instructed to return a verdict for plaintiff for the market value of the gas at the mouth of the well, the verdict to be not less than $3,122.99 tendered by the defendant, nor more than $3,860.64, to-wit, .8¢ per MCF, the highest market value at the well testified to by anyone. Plaintiff sought to have the case submitted on the theory that since the proof showed that the gas from his well was actually used for light and fuel purposes, though it also showed that there was an established market price at the well for gasoline uses, this market value could not be considered by the jury, and there being no market value at the well for light and fuel purposes, plaintiff was entitled to show if he could,

and the jury was entitled to find for him, the actual value of the gas for such uses.

The District Judge, apparently of the opinion that the evidence presented an issue on whether or not the gas had a market value at the well and that the case was ruled by Sartor v. United Gas Public Service Co., 84 F.2d 436, followed neither the theory of plaintiff nor that of defendant. He denied defendant's requests and sent the case under general instructions on all the evidence to the jury for a verdict. There was a verdict for plaintiff for 3.29¢ per MCF on a pressure basis of 13.45 pounds per square inch, or 4¢ per MCF on a pressure basis of 16.4 pounds per square inch, or a total of 15,-828.94. Appellant is here insisting that this disposition does violence to every decision of this court[2] and of the courts of Texas,[3] that, under a lease of this kind providing that lessee becomes the owner of the gas and must pay for it the market value at the well, where a market value is shown, that showing controls, and inquiry as to actual value is irrelevant. Pointing to the undisputed evidence that the gas had a definite and certain market value at the well, he urges upon us that all of the other evidence was improperly admitted; and that since this market value was not more than that tendered, or at least not more than .8¢ per MCF, a verdict should have been instructed for defendant for the amount it had tendered, $3,122.99, or, in the alternative, for not more than $3,860.64.

In view of the fact that there was some testimony fixing the market value of the gas at the well at a figure higher than that used by appellant in making its tender, we cannot agree that a verdict should have been instructed for it for the amount of the tender. We do agree with it though that plaintiff's recovery was measured by the market value of the gas at the well; and that none of the evidence was admissible except that which went to

[2] Arkansas Natural Gas v. Sartor, 5 Cir., 78 F.2d 924; Sartor v. United Gas Public Service Co., 5 Cir., 84 F.2d 436, 437; Union Producing Co. v. Pardue, 5 Cir., 117 F.2d 225; Hemler v. Hope Producing Co., 5 Cir., 117 F.2d 231; Haynes v. Southwest Natural Gas Co., 5 Cir., 123 F.2d 1011; Sartor v. Arkansas Natural Gas Corporation, 5 Cir., 134 F.2d 433; Cf. Wall v. United Gas Public Service Co., 178 La. 908, 152 So. 561; Sartor v. United Carbon Co., 183 La. 287, 163 So. 103; Sartor v. United Gas Public Service Co., 186 La. 555, 173 So. 103.

[3] International-Great Northern R. Co. v. Casey, Tex.Com.App., 46 S.W.2d 669; Danciger Oil & Refineries v. Hamill Drilling Co., 141 Tex. 153, 171 S.W.2d 321. Ann. note 110 A.L.R. 1375.

establish this market value. We agree with it, too, that the fact that instead of processing in its gasoline plant the gas it took from plaintiff's well, it delivered it to a pipe line company in exchange for gas that company owned in another portion of the field where appellant had a gasoline plant and needed gas for that use, is wholly without bearing on the case. Finally we agree with it that the amount due plaintiff must be determined without regard to the use its lessee made of the gas. Plaintiff was entitled to be paid on the basis of the market value of the gas at the well, and the answer to whether a jury issue was made out is to be found not in the actual use made of the gas in question but in whether plaintiff's gas had a market value at the well and what that market value was. Appellant and appellee agree that there was no market at the well for the gas for light and fuel purposes. But this was by no means all of the testimony. It was abundantly established beyond dispute that, for use in gasoline plants, there was an established market value somewhere around the amount defendant tendered. This being so, it is quite plain that the judgment must be reversed and the cause remanded for the determination of the amount due plaintiff measured by the market value of the gas at the well. In the Louisiana cases relied on by plaintiff and the District Judge there was no question, as there is here, of two uses for the gas in the field with a market at the well for one of those uses and no market for the other. In those cases the focal points of the struggle were: (1) whether there was a daily market at the well for the one use to which all the gas from this field was being put; and (2) if there was, what was the value at the well, taking into consideration all the relevant factors in the field where the gas was used. In this case there is a market value for the gas at the well for gasoline plant use, and normally that value would be controlling.[4] But plaintiff, admitting that if his gas had been piped to the gasoline plant, he would have been entitled to no more than its market value for gasoline plant purposes,[5] urges that because the gas was not processed in a gasoline plant but was delivered to a pipe line company for use by it for light and fuel, plaintiff can insist that the value of his gas should be determined not on its market value at the well where appellant took it, but by its value for light and fuel uses determined by a consideration of pipe line royalties and purchases. We cannot agree. There was no market for appellee's gas for light and fuel purposes. For such uses it would bring nothing. There was a market for, and an established market value of, his gas for gasoline plant uses. The price of a thing is what it will bring, and appellee cannot decline to take the price thus established upon the claim that his gas was not used in a gasoline plant but for light and fuel. It was not used for light and fuel under purchase from him, or even under purchase from his lessee, and the court below so charged. Lessee did not sell the gas. It simply traded it for an equal quantity of the same kind and of the same market value in another part of the field for use in its gasoline plant there. It received the gas as owner under its lease, and it was obligated to pay appellee the market value at the well, no more and no less, and this without regard to the use made of it.[6] The case is controlled by Shamrock Oil Co. v. Coffee, supra, and the judgment must be reversed and the cause remanded for the determination under appropriate instructions of the market price. While it is not likely that the same charge will be given, attention should be called to the error in charging that the burden was up-

[4] Haynes v. Southwest, 5 Cir., 123 F.2d 1011; Shamrock Oil & Gas Corporation v. Coffee, 5 Cir., 140 F.2d 401.

[5] The Court: "Suppose your identical gas had been piped to the gasoline plant, would it have been any different from what it is now?"

Mr. Ochsner: "Yes, sir; I would be in the same shape those other persons on the line, then it would be a question of what gas was worth for gasoline purposes, but that is not my case. If they had tied me on to their gasoline line up there I would be in a different shape, but when they take it and put it in the light and fuel market, then I should get light and fuel market prices. They actually put my gas into a light and fuel market."

[6] Cf. Gulf Production Co. v. Taylor, Tex.Civ.App., 28 S.W.2d 914; Humble Oil & Ref. Co. v. Poe, Tex.Com.App., 29 S.W.2d 1019; Lone Star Gas Co. v. Stine, Tex.Com.App., 41 S.W.2d 48, 82 A.L. R. 1299.

on the appellant to show what was the proper compensation.[7] The burden was upon the appellee, plaintiff below, throughout, to establish the amount due it. The judgment is reversed and the cause is remanded for further and not inconsistent proceedings.

---

[7] The court charged in this case that appellant did not sell the gas but used it in his own business, and it, therefore, devolved upon him to show what the just compensation was.