Lillian Blanche BRENT, Frances Diane Neal and the American National Bank, Executors of the Estate of Terry Thompson, Jr., and Phillip Thompson, Individually and as Trustees, Plaintiffs,

v.

NATURAL GAS PIPELINE COMPANY OF AMERICA, Defendant.

J. M. HAWLEY, Independent Executor & Trustee of the Estate of W. H. Taylor, Deceased, Plaintiff,

v.

NATURAL GAS PIPELINE COMPANY OF AMERICA, Defendant.

Civ. A. Nos. 2–75–167, 2–75–168.

United States District Court, N. D. Texas, Amarillo Division.

Aug. 2, 1978.

Supplemental Opinion Sept. 13, 1978.

Howard F. Saunders, Sanders, Saunders, Brian, Finney & Thomas, Ronald D. Nickum, Amarillo, Tex., for plaintiffs.

Dennis M. Dylewski, Dyche & Wright, James T. Wright, John L. Verner, Houston, Tex., H. A. Berry, Underwood, Wilson, Sutton, Berry, Stein & Johnson, Amarillo, Tex., for defendant.

## MEMORANDUM OPINION

WOODWARD, Chief Judge.

These cases were heard before the court, without a jury on the 20th and following days of June, 1977. After hearing and con-

sidering the evidence and the argument and briefs of all parties the court filed a memorandum opinion and additional findings of fact and conclusions of law on September 20, 1977 in each case. Subsequently plaintiffs filed motions to vacate and substitute findings of fact and conclusions of law contained within the above mentioned memorandum opinions. After considering said motions, the briefs filed in support of same and in opposition thereto, arguments of counsel, and after reconsidering the evidence and applicable case law, the court hereby withdraws its prior memorandum opinions and files this memorandum which shall constitute its findings of fact and conclusions of law in each case.

Plaintiffs and intervenors (hereinafter referred to as plaintiffs) are the owners of the royalty payable under certain gas leases covering lands situated in Moore County, Texas (Stipulation No. 3 and the Exhibit referred to therein). The leases were originally executed in the period from 1926 to 1929 and were later amended in 1934 and 1940, but these amendments are not relevant to the controversy before the court. The defendant is the successor in interest to the original lessees and is the producer of the natural gas from the lands encompassed by the leases. Defendant transports all the gas produced from said leases outside the State of Texas.

By stipulation in the Pre-Trial Order (No. 4) it was agreed that each of the leases contained the following clause pertaining to the payment of royalty to lessors on the gas produced and sold or used off of the leased premises:

"the market value at the well of one-eighth (⅛) of the gas produced, saved, and sold or used off the leased premises."

Defendant has paid to plaintiffs a royalty which in recent periods has been based solely upon the price approved by the Federal Power Commission (FPC) in connection with a certificate of convenience and necessity authorizing the interstate transportation and sale of the gas in question. Plaintiffs contend that they have been underpaid, that is, the market value of the gas (upon which their royalty is based) is greater than the FPC controlled price, and their prayer is for recovery of this difference plus pre-judgment interest.

■ The parties have stipulated that Natural Gas Pipeline Company of America, defendant, is a natural gas company as defined by the Natural Gas Act, 15 U.S.C. § 717, et seq., and that the gas produced from the subject leases and relevant to this case is transported and sold in interstate commerce and has been irrevocably dedicated to the interstate gas market. Accordingly, this gas and the sale thereof by the defendant to its interstate purchaser is subject to the regulation and control of the FPC.

Jurisdiction of the parties and subject matter of this controversy is vested in this court pursuant to 18 U.S.C. § 1332. The amount in controversy exceeds $10,000.00 and there is no dispute about the fact of complete diversity.

■ The defendant, by motion, has contended that the FPC has primary jurisdiction over the question of royalty prices and that this court should not determine the controversy here involved. This motion has heretofore been overruled. It was and is the opinion of this court that the FPC does not have such jurisdiction and that royalty owners are not engaged in the sale of natural gas within the meaning of the Natural Gas Act, supra. Mobil Oil Corporation v. Federal Power Commission, 149 U.S.App. D.C. 310, 317, 463 F.2d 256, 263 (1972), cert. denied, 406 U.S. 976, 92 S.Ct. 2409, 32 L.Ed.2d 676. This is a controversy concerning the amount of royalties payable to royalty owners which must be determined by this court rather than by the FPC.

The plaintiffs in this case are claiming additional royalty payments from November 1, 1971 to date of judgment, recognizing that any claim prior to that date would be barred by limitations. The intervenors pray for additional royalty payments for the period beginning April 1, 1973.

Before a determination is made as to the "market value" of the gas in question, upon

which plaintiffs' royalty is based, it is necessary to determine the validity of defendant's affirmative defenses of estoppel, waiver, ratification, accord and satisfaction and a claim of offset.

■ Defendant argues that the following provisions contained in some of the gas division orders between plaintiffs and defendant completely bar any recovery in this case: (Pltf. Hawley Exs. 2 and 3)

"Such royalty interest shall be paid to the royalty owners . . . at the following rates to-wit: . . . and for the remaining life of their contract one-eighth (⅛) of five cents (5¢) per thousand cubic feet."

"This division order _____ constitutes an amendment to such lease."

But contrary to the provisions of these gas division orders, the court finds that the specific payments "for the remaining life of this contract" were not made in the amounts called for. Periodically the defendant would alter the royalty paid per mcf (in each case it was raised above the amount called for in the division orders). For the period involved in this litigation the defendant has never paid the exact amount called for in the gas division orders, but has in fact paid to the plaintiffs a much higher royalty.

■ "The life of the contract," as referred to in these gas division orders, has expired and they are no longer effective so as to govern the amount per mcf to be paid to plaintiffs as royalty. When the royalty changes were effected by notification of the change given plaintiffs by the defendant (Pltf's Exs. 11, 12 and 13) and such changes were accepted by plaintiffs' acquiescence thereto, the gas royalty division orders were terminated, abandoned, and rescinded by the course of conduct of the parties. *Marsh v. Orville Carr Associates, Inc.*, 433 S.W.2d 928, 931 (Tex.Civ.App.—San Antonio, 1968 *writ ref. n. r. e.*).

■ It is concluded that there has been no waiver, ratification, estoppel or an accord and satisfaction that would bar plaintiffs' recovery in this case. Defendant is not entitled to any offset for amounts paid in excess of the specific royalty amounts called for in the division orders as the act of defendant in raising the amount and the act of plaintiffs in accepting same effectively cancelled the prior royalty arrangement and the plaintiffs were not bound thereby.

Having determined that the affirmative defenses pled by defendant do not operate to bar plaintiffs' claims, nor does defendant's claim of overpayment entitle it to any offset, the court now turns to the issue of whether defendant has met its obligation under the "market value" royalty clauses by paying royalties based on prices equal to, or higher than, the area rates established by the FPC for the geographical region where defendant's wells are located.

■ In order for defendant to have met this obligation it is clear that the royalties paid to plaintiffs must have been based upon an amount representative of the "market value" of the gas being produced, and not merely upon what defendant received for the gas. *J. M. Huber Corporation v. Denman*, 367 F.2d 104 (5th Cir. 1966); *Texas Oil & Gas Corporation v. Vela*, 429 S.W.2d 866 (Tex.1968). Otherwise the royalty clause would be transformed to a "net proceeds" provision rather than a "market value" provision.

■ The test for "market value" of interstate gas has been thusly stated:

". . . what would a willing seller and a willing buyer in a business which subjects them and the commodity to restriction and regulation, including a commitment for a long period of time, agree to take and pay with a reasonable expectation that the FPC would approve the price (and price changes) and other terms and then issue the necessary certificate of public convenience." *Weymouth v. Colorado Interstate Gas Company*, 367 F.2d 84 (5th Cir. 1966).

In implementing the above test, "market value" of gas is to be determined by sales of gas comparable in time, quality and availability of marketing outlets. *Vela, supra*, at 872, citing *Phillips Petroleum Co. v. Byrum*, 155 F.2d 196 (5th Cir. 1946).

Thus the issue before this court, narrowly drawn, is: What gas sales are comparable in determining the market value of the gas in question given the fact that such gas has been irrevocably dedicated to interstate commerce?

Both parties urge that their respective expert(s) have complied with the *Weymouth* test, and also with the evidentiary guidelines of *Vela*, in formulating their opinions as to the "market value" of the gas during the relevant time periods in question.

Plaintiffs' experts, both highly qualified in the field, examined gas sales contracts of both intrastate sales and interstate sales which were executed during the time period in question to arrive at their opinion of "market value." It is urged that these are the only opinions which comply with the *Vela* evidentiary standard of comparability in terms of time, quality and availability of marketing outlets. Plaintiffs also urge their experts' opinions took into consideration the effects of FPC regulation, thus meeting the *Weymouth* test, because such regulatory effects were inherent in the prices of the contracts examined, that is, the buyers and sellers of those contracts necessarily considered FPC regulation when arriving at the prices stated in such contracts.

Defendant's expert witness, Jack Baumel, gave two alternative opinions as to the market value of the gas in question. First, based on his perception that there are two distinct markets for natural gas in the geographical area in question, that is, the uncontrolled intrastate market and the controlled interstate market, he gave his opinion that the market value of the gas at issue was the FPC area rates established for the geographical area in which the wells producing such gas were located. He reasons that the only market available for gas irrevocably committed to interstate commerce is the controlled interstate market, therefore, absent special circumstances, the only price available for such gas is that received on interstate sales which is necessarily the established FPC area rate.

Alternatively, Baumel gave his opinion that the market value of the gas in question was the weighted average of prices received for all current sales of gas, both intrastate and interstate, in the applicable geographical area during the relevant time period.

■ This court concludes, considering FPC regulation of interstate gas, that under the facts of the instant case only sales of interstate gas are comparable to determine the "market value" of the gas in question, and that sales of intrastate gas are not comparable to make such a determination. *Hemus & Company, et al. v. Hawkins, et al.*, 452 F.Supp. 861 (S.D.Tex., decided June 20, 1978). There are two markets for gas, intrastate and interstate, but the only market for the gas in question in the instant case is the interstate market.

■ In view of this conclusion the court finds that Mr. Baumel's first opinion of "market value" is the only opinion which meets both the *Weymouth* and *Vela* standards, and therefore, is the opinion which correctly states the "market value" of the gas at issue.

■ The opinions given by plaintiffs' expert witnesses must be rejected for two reasons. First, said opinions take into consideration both sales of intrastate and interstate gas in determining "market value." Secondly, it was shown that many of the interstate gas sales contracts examined and considered by plaintiffs' witnesses reflected prices which were short term or emergency sales prices, small producer prices, prices allowed for newly discovered gas and prices which were rolled back to the FPC rate. Under the facts of this case involving vintage gas, a large producer, and where no special exceptions were shown to exist which would support a petition by either plaintiffs or defendant to the FPC for higher rates, the court is of the opinion that many of the interstate sales contracts, upon which plaintiffs' market value opinion is based, are not comparable to determine market value.

Mr. Baumel's second opinion based upon the volume weighted average formula must

also be rejected because it is founded upon consideration of both intrastate and interstate sales, and upon contracts which were entered into many years before the periods in question in this case.

Mr. Baumel's primary opinion meets the *Weymouth* test of market value in that it obviously takes into consideration the facts of a regulated market and regulated commodity and also realistically sets forth the only price a willing buyer and willing seller could accept in the FPC controlled interstate market which is, absent special exceptions, the FPC applicable area rate. This opinion also satisfies the evidentiary standard of *Vela* in that when one considers sales of like gas, that is, of the same vintage, in a like market (interstate), during the relevant period, the only price which could be received for such gas, again absent some special exception, is the FPC established rate.

Therefore, the court concludes that the market value of the gas here in question is for the relevant period, the stipulated FPC area rates set forth in Stipulation No. 20 of the Pre-Trial Order (No. 4).

This conclusion is mandated by the test set forth in *Weymouth, supra,* and is supported by the *Hemus* case, *supra,* which is directly in point. Additionally, this result is not precluded by the decisions in *Vela, supra, J. M. Huber, supra,* or *Kingery v. Continental Oil Co.,* 434 F.Supp. 349 (W.D.Tex. 1977).

In *Vela* the Texas Supreme Court was concerned with determining the market value of intrastate gas committed to a long term contract. The court held that the lessee could not avoid its obligation to pay "market value" to the royalty owner merely because of its failure to protect itself from escalating prices. In *Vela* the court was not dealing with a commodity irrevocably committed to a regulated market and the opinion gives very little guidance as to what sales would be comparable in such a situation.

The *J. M. Huber* court phrased the question facing it as follows: "whether under the terms of the oil and gas lease from

Lessors to Lessee-Producer the amount payable as royalty is to be fixed by the stated percentage (¼th) of a.) the price received by Lessee from its Pipeline Purchaser or b.) the market price for like gas in the field." The court held that under the terms of the lease, the agreement was not to pay one-fourth of the price received from the market on which the gas in question was sold, rather it was to pay one-fourth of the "market value" and that the terms of the pre-existing contract with the interstate pipeline company did not necessarily determine "market value." However, the question of "market value" was left open to be tried later.

This court is not holding that the defendant must pay royalties based solely on the price it receives for the gas, rather the holding is that the "market value" of the gas here in question, based on comparable sales in the interstate market, is the FPC area rate. The court recognizes that in reality the result may be the same, that is, what the defendant receives for its gas will likely be what the "market value" or FPC area rate is, but this result stems from the fact that the only comparable sales of gas are those made in the interstate market and not from the proposition that defendant need only pay royalty based on what it receives.

In *Kingery v. Continental Oil Co.,* 434 F.Supp. 349 (W.D.Tex.1977), the court in a case similar to the one at bar held that the plaintiff was not bound to accept royalties based on the FPC regulated price, when the lease provided for royalties based on "market value." The court in *Kingery, supra,* based its holding upon the conclusion that plaintiffs did not necessarily contemplate that royalty rates would be affected by regulation of the FPC, because the leases involved in that case were executed prior to the decision in *Phillips Petroleum Co. v. Wisconsin,* 347 U.S. 672, 74 S.Ct. 794, 38 L.Ed. 1035 (1954), and prior to that decision no court had held that the Natural Gas Act gave the FPC authority to regulate contractual rates charged by producers selling gas to interstate pipelines. Although the leases

in the instant case were executed far prior to the effective date of the Natural Gas Act or *Phillips, supra,* the court finds the decision in *California v. Southland Royalty Co.,* 436 U.S. 519, 98 S.Ct. 1955, 56 L.Ed.2d 505 (decided May 31, 1978), a compelling reason to disregard the proposition set forth in *Kingery,* that the plaintiffs could not and did not contemplate royalty rates would be affected by FPC regulation. Here as in the *Southland Royalty* case the plaintiffs were mineral lease owners who entered into a lease permitting the leaseholders to make interstate sales. They did not object when defendant sought to place the gas in interstate markets. As was said in *Southland Royalty, supra,* 98 S.Ct. at p. 1960: "Having authorized [defendant] to make interstate sales of gas, [plaintiffs] could not have expected those sales to be free from the rules and restrictions that from time to time would cover the interstate market." Similarly, plaintiffs here could not expect the royalty obligation existing under the lease to be determined free from the rules and restrictions which attach to the market and the commodity to which such leases are applicable.

Further, plaintiffs have strenuously argued that the Natural Gas Act, effective subsequent to the date the leases here in question were executed, cannot alter the prior contracts of lease. *California v. Southland Royalty Co., supra,* makes it clear, however, that FPC jurisdiction does extend to gas dedicated to interstate commerce, even though such jurisdiction and the right to regulate thereunder may drastically alter the private rights of individual parties having an interest in such gas. Although *Southland Royalty Co.* is not directly in point, the reasoning of that opinion convinces this court that FPC jurisdiction over interstate gas may alter the private rights of parties not subject to that jurisdiction, to the extent that such jurisdiction may limit the scope of sales which can be considered in determining "market value" of interstate gas. Thus, as has already been pointed out, the only sales which can be considered comparable in determining "market value" of the gas in question are

sales of like gas occurring in interstate commerce, and when only interstate sales are considered the only "market value" for the gas in question is the applicable FPC area rates.

Plaintiffs also seem to argue that the FPC area rates as stipulated to in the Pre-Trial Order (No. 4) do not necessarily limit the price which can be received for interstate gas similar to the gas involved in this case, and therefore, those rates should not constitute "market value" of the gas in issue. This argument is premised on the fact that since 1970 the FPC has issued various orders and opinions increasing the rates applicable to interstate gas in the geographical areas where defendant's wells are located. However, it appears to the court, after consideration of such orders and opinions, that the stipulated rates are the only rates available for interstate gas of the same vintage as the gas herein involved, absent some special exception. There was no evidence that any grounds for a special exception existed in this case and no evidence that any interstate producers of the same size classification of defendant, located in the same geographical area as defendant's wells with gas of the same classification as the defendant's gas, were receiving prices in excess of the stipulated FPC applicable area rates, in the absence of some special exception.

In conclusion the court finds that there are two distinct markets for gas in the geographical area where defendant's wells are located, the interstate market and the intrastate market. The gas in this case has been irrevocably dedicated to the former. Therefore, only interstate gas sales in the relevant geographical area, made by producers of the same classification as defendant and involving gas of the same vintage as the gas in question, are comparable to determine the "market value" of the gas involved in this case. A comparison of these sales, as is evidenced by Mr. Baumel's primary opinion, reveals that "market value" of the gas in question is the stipulated FPC applicable area rates after said rates

have been adjusted by specific provisions contained in various applicable orders of the FPC establishing such rates. Thus, plaintiffs are entitled to royalties based upon "market value" determined by such rates after said adjustments.

This opinion shall constitute the findings of fact and conclusions of law in each of the above cases and the Clerk is directed to file same in each case for such purposes.

It is hereby ordered that counsel for all parties will confer and submit a proposed judgment in each case to the court on or before August 31, 1978, which judgments will be in accord with this opinion.

The Clerk will furnish a copy hereof to each attorney.

### SUPPLEMENTAL OPINION

This memorandum opinion is written supplemental to the court's memorandum opinion of August 1, 1978 and in response to the motions for judgment made by each party and the letter-briefs in support thereof.

The court is of the opinion that the market value of the royalties, during the time in question, were those amounts as set forth in Stipulation No. 20 contained in the pre-trial order of this court and approved by all attorneys. The court further finds that these amounts have been paid by the defendant to the plaintiffs and that a take nothing judgment will be entered in each case.

The stipulation of the parties (Stipulation No. 20 in the Pre-Trial Order), and the plaintiffs' response to Interrogatory No. 2 establish the fact that the royalty rates paid plaintiffs during the period of time in question in this case are the same as the prices established for the sale of gas by major producers in interstate commerce as such rates are fixed by the Federal Power Commission.

The record does not contain any evidence that would support a finding that any other rate was applicable to the gas in question and, as found in the original memorandum opinion of this court, the rates as shown in Stipulation No. 20 and the answer to Interrogatory No. 2 reflect the fair market value of the gas in question.

It is recognized that for one six months' period, July 1, 1972 to January 1, 1973, the rates paid were less than that shown on Stipulation No. 20, but in other periods of time the amounts paid exceeded the rates in Stipulation No. 20. Overall, for the entire time in question, plaintiffs have been paid an amount equal to or exceeding the rates stipulated to be the rates as fixed by the Federal Power Commission. There being no pleading to support any counterclaim by defendant against plaintiffs for any overpayment, no relief will be afforded defendant in this respect.

A judgment will this date be entered accordingly, and this supplemental memorandum opinion applies to each of the above cases.