Francia Goodwin Coe KINGERY,
Plaintiff-Appellee,

v.

CONTINENTAL OIL COMPANY,
Defendant-Appellant.

Lillian Blanche BRENT and Phillip Thompson, Individually and as Trustees, Etc., et al., Plaintiffs-Appellants,

v.

NATURAL GAS PIPELINE COMPANY OF AMERICA, Defendant-Appellee.

J. M. HAWLEY, Independent Executor and Trustee of the Estate of W. H. Taylor, deceased, Plaintiff-Appellant,

v.

NATURAL GAS PIPELINE COMPANY OF AMERICA, Defendant-Appellee.

Nos. 78–1015, 78–3245 and 78–3246.

United States Court of Appeals,
Fifth Circuit.

Oct. 2, 1980.

W. B. Browder, Jr., Midland, Tex., Fred O. Hull, Houston, Tex., for Continental Oil Co.

Earl A. Brown, Jr., pro se amicus curiae.

Frank G. Harmon, Baker & Botts, Stephen M. Hackerman, Houston, Tex., Leo Hoffman, Dallas, Tex., C. M. Hudspeth, Houston, Tex., Joe Harlan, Amarillo, Tex., E. R. Norwood, Liberty, Tex., Charles L. Black Aycock, Houston, Tex., for LaGloria Royalty Owners & Assn., Inc.

Grambling, Mounce, Sims, Hardie, Galatzan & Harris, John S. Birkelbach, William J. Mounce, El Paso, Tex., for Kingery.

Ronald D. Nickum, Howard F. Saunders, Amarillo, Tex., for Brent and Thompson, et al. and Hawley.

Robert Lee Bobbitt, Jr., San Antonio, Tex., for Sealy and Smith Foundation for the John Sealy Hospital.

H. A. Berry, Amarillo, Tex., Dennis Dylewski, John L. Verner, James T. Wright, Houston, Tex., for Natural Gas Pipeline Co. of America.

Before COLEMAN, Chief Judge, and FRANK M. JOHNSON, Jr. and POLITZ, Circuit Judges.

COLEMAN, Chief Judge.

These are three cases with rather similar facts, almost identical legal arguments, and diametrically opposing judicial results. We affirm No. 78–3245, *Brent v. Natural Gas Pipeline Company of America*, 457 F.Supp. 155, and No. 78–3246, *Hawley v. Natural Gas Pipeline Company of America*. We reverse No. 78–1015, *Kingery v. Continental Oil Company*, 434 F.Supp. 349.

In every case the plaintiffs are *royalty* interest owners under mineral leases covering land located in Texas. The defendants are lessee-producers. In every case the natural gas produced from the leasehold is transported and sold in interstate commerce under a certificate of convenience and necessity from the Federal Energy Regulatory Commission (FERC). This natural gas has been irrevocably dedicated to the interstate market. The natural gas and the sales thereof to interstate purchasers have been subject to the regulation and control of the FERC, Natural Gas Act, 15 U.S.C. §§ 717 et seq. In each case the lease required the defendant-lessee to pay royalties based on the *market value of the gas*. In actual practice, the lessee paid the royalties based upon the sales price in the interstate market.

The royalty owners contend that the market value of the gas was greater than the interstate sales price. Suit was brought to recover alleged deficiencies in royalty payments for the four years previous to the date of filing the suit,[1] but it must be noted that the royalty owners invariably accepted the royalty payments as tendered and never returned any of the payments received.

### I. The Brent and Hawley Cases

In the first two cases, *Brent* and *Hawley*, the plaintiffs are the owners of the royalty payable under gas leases covering land situated in Moore County, Texas. The leases were executed between 1926 and 1929 and were amended in 1934 and 1940, but the amendments are not involved in this dispute. The Natural Gas Pipeline Company of America is the natural gas producer under these leases and all of the gas produced is sold on the interstate market.

Each of the leases defined the amount of royalty to be paid as "the *market value* (emphasis added) at the well of one-eighth (⅛) of the gas produced, saved, and sold or used off the leased premises." Claiming that the *market* value of the gas was greater than the interstate *sales* price of the gas, the royalty owners sued to recover the alleged difference between the royalty actually paid and the royalty they would have received had the royalty been based on the market value of the gas, plus pre-judgment interest. The trial court found that the lease permitted interstate sales and that the mineral owners did not object when the lessee placed the gas in the interstate market.

In the proceeding below, the owners' expert witnesses based their opinion concerning market value on both interstate and intrastate sales of gas during the time involved in this dispute. Because the sales price of natural gas on the uncontrolled intrastate market in Texas was higher than the sales price on the controlled interstate market, the market value of the gas in question, in the opinion of the owners' expert witnesses, was greater than the sales price received by the defendant-producer.

On the other hand, the defendant-producer's expert offered two alternative opinions as to market value. One of these opinions, based solely on interstate sales in the area,

---

1. The parties agree that Texas' four-year statute of limitations applies to these cases. Tex.

Code Ann. tit. 91, § 5527 (Vernon).

was that the market value of the gas was identical to the sales price received by the defendant-producer. The second opinion of market value was a weighted average of prices received for all gas sales, both intrastate and interstate, in the relevant geographical area during the applicable period of time.

The District Court held that the market value should be determined from evidence of recent sales of comparable gas on the interstate market. For this reason the trial court accepted the first stated opinion of the defendant-producer's expert, i. e., that the market value and sales price were identical. The District Court went on to note that the market value was the same as the FERC price ceiling in the area because all comparable gas in the area was being sold at the ceiling price. The Court then held that under the facts, the FERC price ceiling was the market value of the gas. Consequently, the District Court denied all relief sought by the royalty owners.

## II. *The Kingery Case*

In the third case, the plaintiff, Kingery, owns an undivided one-half royalty interest under a mineral lease executed in 1944, encompassing land situated in Live Oak County, Texas. The defendant, Continental Oil Company, is the gas producer under this lease.

Pursuant to a contract entered into in 1949, the defendant-producer has sold this gas to Transcontinental Pipeline Corporation for transportation and resale in interstate commerce. By its terms, the contract would have expired no later than April 1, 1971, but in 1970 the defendant-producer and Transcontinental amended the contract and extended it until 1981.

The trial court found as a matter of fact that between 1949 and 1970 the only market for the gas produced from the lease and for gas of like quantity and quality in the area was the interstate market. The Court found, however, that from 1972 until the present, the intrastate market had been available. The lease provided that the les-

see had the obligation "to use all reasonable efforts to find a market . . . and to commence or resume the marketing . . when a market [is] available." The trial court found that the Transcontinental Pipeline contract which dedicated the gas to interstate commerce was reasonable.

The gas royalty provision of the lease stated:

3. The royalties to be paid by Lessee are: . . . (b) on gas, including casinghead gas or other gaseous substance, produced from said land and sold or used off the premises or in the manufacture of gasoline or other product therefrom, the market value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale.

Claiming that the gas had been sold off the premises and that the market value of the gas exceeded the sales price under the contract with Transcontinental, the royalty owner sued in 1976 to recover the alleged difference between the royalty she had actually received and the amount of royalty she would have received had the royalty been based on the market value of the gas.

In the trial below the royalty owner's expert witnesses based their opinion as to the market value of the gas *solely on area sales of comparable gas in the intrastate market.* Making no distinction between the interstate and intrastate markets, the District Court held that market value was to be established by evidence of gas sales and contract negotiations for gas sales in the immediate area during the relevant years. The Court, therefore, accepted the opinion of the royalty owner's experts as to market value and awarded the plaintiff-owner $323,592.30 in unpaid royalties. The defendant-producer appealed.

## III. *Analysis*

The controlling question [2] in each of these cases is the same: How is the market value of this natural gas to be determined?

---

2. The various appellants raise a number of other issues which we need not reach because of our disposition of these cases based on this controlling issue.

The royalty owners essentially argue that market value is to be gleaned from all sales of comparable gas in the geographical area during the period in question on both the interstate and intrastate markets. They point out that this approach reflects the traditional willing-buyer, willing-seller standard. On the other side, the defendant-producers contend that in determining market value, only sales on the interstate market should be considered because the gas has been irrevocably dedicated to interstate commerce.

The standard test for determining the market value of gas sold on the interstate market is

> [W]hat would a willing seller and a willing buyer in a business which subjects them and the commodity to restriction and regulation, including a commitment for a long period of time, agree to take and pay with a reasonable expectation that the FPC [now the FERC] would approve the price (and price changes) and other terms and then issue the necessary certificate of public convenience and necessity.

*Weymouth v. Colorado Interstate Gas Company*, 367 F.2d 84, 90 (5 Cir. 1966).[3] The Supreme Court of Texas has said that the market value of the "gas is to be determined by sales of gas comparable in time, quality and availability to marketing outlets," citing *Phillips Petroleum Co. v. Bynum*, 155 F.2d 196 (5 Cir. 1946). *Texas Oil & Gas Corp. v. Vela*, 429 S.W.2d 866, 872 (Tex.Sup.Ct.1968). However, *Vela* was not concerned with gas which had been dedicated to interstate commerce.

In light of this test, to determine the market value of the gas in question the Court must decide which gas sales are comparable, given the ineluctable fact that this gas has been irrevocably dedicated to interstate commerce and the price is subject to regulation. We are of the opinion that where the gas has been irrevocably dedicated to the interstate market, it follows inexorably that the only comparable sales to be used in determining the market value of such gas are sales on the interstate market. It likewise follows that sales on the intrastate market are not comparable in determining the market value of such gas. *Hemus & Company v. Hawkins*, 452 F.Supp. 861 (S.D.Tex.1978).

The royalty owners strongly argue that this conclusion is precluded by the decisions in *Texas Oil & Gas Co. v. Vela*, 429 S.W.2d 866 (Tex.Sup.Ct.1968) and *J. M. Huber Corp. v. Denman*, 367 F.2d 104 (5 Cir. 1966).

As noted *ante, Vela*, involved the determination of the market value of intrastate gas committed to a long-term contract. In that case the Texas Supreme Court held that a lessee could not escape its duty to pay royalties based on the market value of the gas because of its failure to protect itself from rising prices. The decision did not directly deal with interstate gas and, therefore, is not here in point. As the Houston Court of Civil Appeals has stated:

> We do not believe that the Texas courts will apply the principles of *Vela* to federally controlled or regulated interstate gas, since there can be no "market value" or "market price" in a price-regulated environment, although we recognize that the supreme court did permit the consideration in *Vela* of the price of regulated gas sold to Tennessee Gas from the Lopeno Field.

*Exxon Corp. v. Middleton*, 571 S.W.2d 349, 362, n. 3 (Tex.Civ.App.—Houston [14th] 1978), writ granted.

In *J. M. Huber Corp. v. Denman, supra*, the Court stated the controlling issue as:

> [W]hether under the terms of the oil and gas lease from Lessors to Lessee-Pro-

---

**3.** The plaintiff-owners argue that this test has been overruled, at least by implication, in *Mobil Oil Corp. v. Federal Power Commission*, 463 F.2d 256 (D.C.Cir.1971), *cert. denied*, 406 U.S. 976, 92 S.Ct. 2409, 32 L.Ed.2d 676. We disagree. This decision had little to do with the actual determination of the market value of interstate gas. It simply held that the FERC (then the FPC) lacked the authority to regulate the amount of royalty paid and that the FERC price ceiling in the area did not necessarily determine the market value of the gas.

ducer the amount payable as royalty is to be fixed by the stated percentage (¼th of (a) the price received by the Lessee from its Pipeline Purchaser or (b) the market price for like gas in the field.

*Id.* at 106. The Court held that the lease required the lessee to pay one-fourth of the market value of the gas instead of one-fourth of the sales price. The Court then noted that the sales price fixed by the preexistent contract with the pipeline company was not necessarily the market value of the gas; but the Court left the question of market value *to be resolved later.*

*Huber* is not inconsistent with the results we reach in the present cases because we do not hold that the sales price of the gas in question automatically determines its market value; instead we hold only that the market value of *interstate* gas is to be determined by comparison with the sales of comparable gas on the interstate market. This is so because this gas could not be sold on the intrastate market and thus its value on that market was zero. See *Phillips Petroleum Co. v. Ochsner,* 146 F.2d 138 (5 Cir. 1944). Since sellers and buyers of gas in interstate commerce cannot lawfully contract for a price above that allowed by federal regulation, prices above that figure are simply not comparable. This is as far as we need go to decide the cases before us and that is as far as we do go.

The plaintiff-owners argue that the various parties to the leases under consideration never contemplated that the amount of royalty would later be affected by FERC price regulations and that, therefore, FERC regulations cannot alter the rights of the parties under this lease. They point out that the leases were executed before the passage of the Natural Gas Act and the decision in *Phillips Petroleum Co. v. Wisconsin,* 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954) which held that the FERC had the authority to regulate the sales price of natural gas on the interstate market.

We believe that the Supreme Court has rejected this argument in *California v. Southland Royalty Co.,* 436 U.S. 519, 98 S.Ct. 1955, 56 L.Ed.2d 505 (1978). There, in 1925, before the FERC began regulating the price of gas on the interstate market, the plaintiff-owners executed a mineral lease allowing the defendant-producer to sell the gas on the interstate market. Later in 1951 the plaintiff-owners did not object when the defendant-producer contracted to sell the gas to an interstate pipeline. Also, the plaintiff-owners did not object when, after *Phillips,* the defendant-producer sought and received a certificate of convenience and necessity of unlimited duration.

After the lease expired in 1975 the plaintiff-owners attempted to withdraw the gas from interstate commerce in order to sell it on the intrastate market. The FERC (then the FPC) determined that gas once dedicated to the interstate market could not be withdrawn therefrom without FERC authorization. In sustaining this determination the Supreme Court stated in language equally applicable to the present cases:

In any event, we perceive no unfairness in holding . . . lessors responsible for continuation of the services until abandonment is obtained. . . . Having authorized Gulf [defendant-producer] to make interstate sales of gas, respondents could not have expected those sales to be free from the rules and restrictions that from time to time would cover the interstate market. Cf. *Louisville & Nashville R. Co. v. Mottley,* 219 U.S. 467, 482, [31 S.Ct. 265, 270, 55 L.Ed. 297] (1911).

*Id.* at 528–529, 98 S.Ct. at 1960.

In *Brent* and *Hawley* the District Court based its opinion concerning the market value of the gas in question on the sales of comparable gas in the interstate market, the only place where the gas could be sold. We are unable to say that this was error. We, therefore, affirm the judgment of the District Court.

In *Kingery* the royalty owner's only evidence of market value concerned gas sales on the intrastate market; therefore, on the rationale hereinabove set out, the District Court's finding as to market value in that case must be held to be clearly erroneous.

We must reverse this finding and the judgment predicated upon it.

The Judgments in No. 78–3245 and No. 78–3246 are AFFIRMED.

The Judgment in No. 78–1015 is REVERSED.

